NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

KEVIN E.,
*Appellant,*

*v.*

DEPARTMENT OF CHILD SAFETY, A.W.,
*Appellees.*

No. 1 CA-JV 17-0559
FILED 8-7-2018

Appeal from the Superior Court in Maricopa County
No. JD529261
The Honorable Patricia A. Starr, Judge

**AFFIRMED**

COUNSEL

Maricopa County Legal Defender's Office, Phoenix
By Kathryn E. Harris
*Counsel for Appellant*

Arizona Attorney General's Office, Mesa
By Ashlee N. Hoffmann
*Counsel for Appellee DCS*

---

**MEMORANDUM DECISION**

Judge Diane M. Johnsen delivered the decision of the Court, in which Presiding Judge Kenton D. Jones and Judge Paul J. McMurdie joined.

---

J O H N S E N, Judge:

¶1        Kevin E. ("Father") appeals the superior court's order severing his rights to parent his child, arguing that the court erred in concluding that the Department of Child Safety ("DCS") had established grounds for severance and that severance was in the child's best interests. Because substantial evidence supports the court's findings and conclusions, we affirm.

**FACTS AND PROCEDURAL BACKGROUND**

¶2        In September 2015, bystanders called police about an intoxicated woman with track marks on her arm who was begging for money and food with a child at a fast-food restaurant.  Police responded and found the child dirty and dressed in ill-fitting clothes.  The child, then over two-and-a-half years old, had urinated on himself and communicated only through grunts and cries.  The child had various scratches, bruises and scars and three cigarette burns on his inner thigh.  Police discovered the child had been staying in a hotel room with several family members, including the child's grandparents, who had a history of methamphetamine use and domestic violence.  Upon review of its records, DCS discovered it had responded on several previous occasions to reports of substance abuse, domestic violence, homelessness and neglect affecting the child's care.  DCS decided to take custody of the child, who was found to suffer from post-traumatic stress disorder ("PTSD") and to be somewhat developmentally delayed.

¶3        When DCS contacted Father, he smelled of marijuana, and although he denied recent marijuana use, he tested positive.  Father was not working, had no income and no residence of his own, and allowed the child's grandparents to be the child's primary caretakers even though he knew of their substance abuse and domestic violence.  When asked about the child's injuries, Father responded that the child had accidentally burned himself with one of his caregiver's cigarettes.  He also maintained that the

2

child's scratches, bruises and scars came from fighting his two-year-old cousin.

¶4         DCS filed a dependency petition alleging Father abused substances, did not have a job, was not providing stable housing or appropriate parental supervision for the child and had left the child with inappropriate caregivers.[1]  After a preliminary hearing in which Father denied the allegations but submitted the issue for the superior court to determine, the court found the child dependent as to Father on September 30, 2015.

¶5         A psychologist to whom DCS referred Father determined that Father, who had very little formal education and was illiterate, functioned at an extremely low intellectual level.  The psychologist reported that Father did not demonstrate knowledge of appropriate parenting skills and did not understand that he had put his child at risk by leaving him with inappropriate caregivers.  The psychologist concluded that the prognosis was poor that Father would be able to demonstrate minimally adequate parenting skills in the future, with some possibility that the prognosis could become fair with services and support.

¶6         Over the first 18 months of the dependency, Father participated inconsistently in services offered by DCS.  He attended drug-abuse counseling but missed sessions.  He submitted to drug tests, but tested positive on several occasions, missed others, and did not go to the correct testing location on still others.  Father began participating regularly in visits with the child, but during visits he often would only sit with the child and watch television; when Father did interact with the child, he often did so in inappropriate ways.  Father talked about the case in front of the child, which negatively affected the child's behavior before and after visits.

¶7         In April 2017, the superior court changed the case plan from family reunification to severance and adoption, and DCS filed a motion to terminate Father's parental rights based on 15 months' time-in-care. *See* Arizona Revised Statutes ("A.R.S.") section 8-533(B)(8)(c) (2018).[2]

---

[1]     DCS also alleged dependency as to the child's mother, and the court ultimately severed her parental rights based on abandonment.  She is not a party to this appeal.

[2]     Absent material change after the relevant date, we cite a statute's current version.

¶8        Over the following months, Father participated inconsistently in visits with the child through a parent-aide service, cancelling several visits, failing to show up for others, and ending others early when he was unable to control the child's behavior. Although Father made some progress, he continued to show a lack of appropriate parenting skills. He completed his individual counseling service, but was unable to apply the coping skills taught there and became highly emotional when the child did not listen to him; on several occasions, Father began crying during ordinary conversations with the child. Although Father obtained stable housing during this period by moving into another man's apartment, that man did not pass a DCS background check.

¶9        In November 2017, the superior court held a three-day severance trial, after which it entered an order severing Father's parental rights. The court found that DCS's efforts to provide services were reasonable, noting that DCS provided a psychological evaluation, individual counseling, a parent aide, supervised visitation with a case aide, transportation and substance-abuse testing and treatment. In particular, the court found it reasonable that DCS "waited to provide parent aide services until Father demonstrated a period of sobriety, so that he could best utilize the information imparted by the parent aide." The court further found that Father had been unable to remedy the circumstances causing the out-of-home placement, citing Father's struggles to maintain sobriety and obtain appropriate housing, his troubles with the law for driving without a license, and his inability to regulate his emotions in stressful situations and tendency to give into the child's demands when the child was upset. Finally, the court concluded that despite Father's progress in some areas, it was unlikely Father would effectively parent in the near future given the child's special needs and Father's low level of intellectual functioning and inability to control his emotions and retain needed parenting skills and knowledge.

¶10        Father timely appealed. We have jurisdiction pursuant to Article 6, Section 9, of the Arizona Constitution and A.R.S. §§ 8-235(A) (2018), 12-120.21(A)(1) (2018) and -2101(A)(1) (2018).

## DISCUSSION

¶11        Termination of parental rights requires clear and convincing evidence of a statutory ground set out in § 8-533(B), *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 249, ¶ 12 (2000), and proof by a preponderance of the evidence that termination is in the best interests of the child, *see Kent K. v. Bobby M.*, 210 Ariz. 279, 288, ¶ 41 (2005). Because the superior court "is

in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and resolve disputed facts," we will affirm an order terminating parental rights if it is supported by reasonable evidence. *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93, ¶ 18 (App. 2009) (quoting *Ariz. Dep't of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, 334, ¶ 4 (App. 2004)).

## A.    15 Months' Time-In-Care.

**¶12**          To establish the 15-month time-in-care ground under § 8-533(B)(8)(c), DCS must show that (1) the child has been in an out-of-home placement under its supervision for a cumulative total of at least 15 months; (2) it has made "a diligent effort to provide appropriate reunification services"; (3) "the parent has been unable to remedy the circumstances that cause the child to be in an out-of-home placement"; and (4) "there is a substantial likelihood that the parent will not be capable of exercising proper and effective parental care and control in the near future." Father does not dispute that the child has been in an out-of-home placement for more than 15 months, but contends the evidence does not support the remaining three requirements for severance under § 8-533(B)(8)(c).

### 1.    DCS's efforts to provide services.

**¶13**          Father argues DCS did not make a diligent effort to provide him appropriate reunification services. Specifically, Father faults DCS for not referring him for one-on-one therapeutic counseling tailored to the child's special behavioral needs, which he asserts DCS gave to the child's foster parent. Father does not cite evidence in the record that the foster parent actually received a service that he did not, much less evidence that the service would have been appropriate for Father. Moreover, our review of the record does not yield support for Father's contention. The foster parent testified the child's therapist told her about techniques to deal with behavior caused by the child's emotional issues, including his PTSD and anxiety. The parent aide, however, told Father that he too should talk to the therapist about how to deal with the child's behavior related to PTSD. Instead of seeking out that help, Father denied the child had PTSD.

**¶14**          More generally, Father had difficulty retaining parenting techniques he had been taught during the dependency proceedings, and DCS is not required to provide every conceivable service to a parent or "undertake rehabilitative measures that are futile." *See Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 191-92, ¶¶ 31-34 (App. 1999). In other respects, the record supports the superior court's conclusion that DCS made diligent efforts to reunify Father and the child, including, at appropriate

times, offering Father services aimed at helping him improve his parenting skills, such as individual counseling, a parent aide and supervised visits with a case aide.

### 2. Father's inability to remedy circumstances causing out-of-home placement.

¶15 Father disputes several of the superior court's findings that support its conclusion that he had not remedied the circumstances causing the out-of-home placement. First, Father contends that the court's finding that he had inadequate housing was contradicted by evidence that Father had lived in the same residence for five months. But other evidence showed that the apartment he was living in was not appropriate for the child; in fact, Father admitted at trial that he knew his roommate had not passed a background check and that, as a result, the child could not live with him in that apartment.

¶16 Next, Father takes issue with the court's finding that he "has struggled throughout the dependency with maintaining sobriety and consistently drug testing." Father argues he successfully completed drug treatment, the drug-treatment service had issued a letter stating that he had a low risk of relapse, and he had provided DCS with a prescription that explained positive drug tests for opiates and benzodiazepines in February and March 2017. But evidence supports the court's finding: The DCS case manager testified that Father consistently missed drug tests throughout the dependency and had been consistently submitting negative tests only since July or August 2017. Further, the case manager was doubtful that the prescription Father provided was for the drugs that caused the positive tests in early 2017; Father did not produce the prescription at the time of the tests, and, in any event, his behavior during that period caused the case manager to believe that he was abusing drugs. For example, on a visit in late February 2017, the case aide reported that Father was moving slowly, falling over in the couch constantly, and not talkative.

¶17 Father also disputes the superior court's findings that he had trouble controlling his emotions and setting limits for his child during visits, citing testimony from his caseworker and counselor that he contends is contrary to those conclusions. But substantial evidence supported the court's findings: A DCS report dated October 6, 2017 stated that Father "continues to lack the appropriate parenting skills," he had ended two visits early in August 2017 because he was unable to control the child, and, even after Father completed individual counseling, he had trouble regulating his emotions during visits with the child. The parent aide reported that

although Father showed some improvement in setting limits for the child, he "did not have healthy boundaries" with the child during a September 2017 visit, at which he gave in to the child's demands.

**¶18**    Evidence also supported the court's finding that Father had shown a pattern of cancelling visits with the child during the dependency – including four visits or appointments with the parent aide in September 2017, just two months before the severance trial.  That conduct, particularly the cancellations shortly before trial, bolsters the court's conclusion that Father was not dealing well with the stress of parenting.

**¶19**    Evidence also supported the superior court's finding that Father's history of driving without a license was a continuing concern.  Father admitted at trial that he had been jailed several times for driving without a valid license, and that he would go to jail again if caught doing it again.  But before an August 2017 parenting visit, Father told the parent aide that if the taxi he had ordered did not show up, he was going to drive his truck to the visit rather than miss the visit with his child, and at trial, Father admitted that he drove to visits over the summer when his ride did not arrive.  Although Father testified his roommate would be able to give him rides, the roommate had not passed a DCS background check and so would not be permitted to transport the child.

**¶20**    In sum, substantial evidence supported the superior court's findings supporting its conclusion that Father had not remedied the circumstances causing the out-of-home placement.   When reasonable evidence supports the court's findings, we do not reweigh the evidence or second-guess the court's resolution of conflicts in the evidence. *See Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 282, ¶ 12 (App. 2002).

### 3.    Likelihood that Father would not be able to effectively parent in the near future.

**¶21**    Father argues the superior court improperly relied on his November 2016 psychological evaluation and equivocal testimony by the psychologist in concluding that he would not be able to effectively parent in the near future.  Father points out that the psychologist testified it had been nearly a year since she examined Father, and she did not have enough information at the time of trial to conclude that Father's parenting prospects remained poor.  Furthermore, Father contends that the evidence shows that his circumstances changed since the psychologist evaluated him.

**¶22**    In making its finding, however, the superior court primarily relied on the psychologist's testimony relating to Father's low intellectual

functioning – a circumstance, which, according to the psychologist, was unlikely to change over time. To be sure, the court also referenced the psychologist's year-old opinion about the poor prognosis that Father would be able to effectively parent in the future. But the court cited that opinion as a starting point for its analysis of Father's accomplishments and shortfalls during the year following the psychologist's evaluation. Indeed, the court found that Father had "achieved some of the[] goals" set by the psychologist, and at trial, "demonstrated a commitment . . . and a true desire to parent his child." The court also found, however, that Father had not retained the skills and knowledge necessary to effectively parent the child in the future, particularly in light of the child's special needs, and concluded that Father, despite his best efforts, would not be capable of rectifying that shortcoming.

¶23         Substantial evidence supported that finding and conclusion. DCS's case manager, who had been assigned to the case for two years, testified Father lacked cognitive abilities and frequently forgot important information; he had been unable, for example, to remember what the parent aide had tried to teach him about the dangers of domestic violence. The case manager testified that she did not believe Father had the capacity to retain and use the information provided to him and therefore could not effectively parent and would not be able to do so in the near future. Combined with the psychologist's opinion that Father's low level of intellectual functioning was likely to be a permanent condition, reasonable evidence supports the superior court's finding that Father would be unable to effectively parent in the near future. *Cf. Vanessa H. v. Ariz. Dep't of Econ. Sec.*, 215 Ariz. 252, 257, ¶¶ 22, 25 (App. 2007) (affirming severance when parent's "cognitive limitations [were] simply too severe for the child to ever be safe under her care").

B.    **Child's Best Interests.**

¶24         The superior court concluded that severance would be in the best interests of the child, finding that the current placement provided the child with stability, addressed the child's special needs and was willing to adopt the child. The court concluded that the child would benefit from the permanency provided by adoption and that it would be detrimental to the child if Father was making day-to-day decisions about the child's care.

¶25         DCS can establish that severance is in the best interests of the child "by either showing an affirmative benefit to the child by removal or a detriment to the child by continuing in the relationship." *See Jesus M.*, 203 Ariz. at 282, ¶ 14. When the superior court severs a parent-child

relationship, the court "must include a finding as to how the child[] would benefit from a severance or be harmed by the continuation of the relationship." *Xavier R. v. Joseph R.*, 230 Ariz. 96, 99-100, ¶ 11 (App. 2012) (quoting *In re Appeal in Maricopa County Juv. Action No. JS-500274*, 167 Ariz. 1, 5 (1990)); *see also* A.R.S. § 8-538(A) (2018) (order terminating parental rights "shall recite the findings on which the order is based").

¶26 "In combination, the existence of a statutory ground for severance and the immediate availability of a suitable adoptive placement for [a child] frequently are sufficient to support a severance order." *Oscar O.*, 209 Ariz. at 335, ¶ 8. Here, the case manager testified that the child's current placement was willing to adopt him and would provide permanency and stability and meet the child's needs, including those arising from the child's PTSD. Father, on the other hand, had denied that the child had PTSD. Substantial evidence therefore showed that severing Father's parental rights would provide affirmative benefits to the child, while returning the child to Father's care would be detrimental. That showing, combined with the existence of grounds for severance, sufficiently supports the superior court's conclusion that severance was in the child's best interests.

¶27 Father argues the court erred by failing to cite any evidence to support its finding that it would be detrimental to restore Father to the position of making day-to-day decisions for the child. But while the court did not reference particular evidence in the paragraph of its decision in which it reached that conclusion, the court's findings supporting the grounds for severance amply support the conclusion. Among those findings were that Father has a low level of intellectual functioning, continued to be unable "to say no to the child," and continued to drive without a license. These findings all support the court's conclusion that Father was likely to make poor decisions, thereby risking harm to the child.

¶28 Father finally argues that the superior court's decision is erroneous in light of our decision in *Alma S. v. Dep't of Child Safety*, 244 Ariz. 152 (App. 2017), *review granted* (May 8, 2018). The evidence in the record in *Alma S.*, however, was dissimilar to that here in ways that make that case inapplicable.

**CONCLUSION**

¶29        Because substantial evidence supports the superior court's findings and conclusions, we affirm the order severing Father's parental rights.



AMY M. WOOD • Clerk of the Court
FILED:  AA